IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

GAVIN CLASS,                              *

          Plaintiff,                *
                              Case No. _____

     vs.                               *

TOWSON UNIVERSITY,                        *

          Defendant.               *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

*When you take a year off from football, you come back for all the enjoyable moments. When you're not playing, you miss out on all the highs, but you also miss these disappointments. But I would rather be in the arena to be excited or disappointed than not have a chance at all. That's football. That's why everybody plays it.*

**Peyton Manning, Quarterback, Denver Broncos**

*Four years of football are calculated to breed, in the average man, more of the ingredients of success in life than almost any academic course he takes.*

**Knute Rockne, Notre Dame Coach**

This is a case of first impression – never before has a college football player, who suffered a devastating heat stroke and a liver transplant, and then made a miraculous recovery, fought to return to the game that he loves. If Gavin Class was in the military, there is no doubt that he would be allowed to return to active duty once his doctors cleared him to return, and he passed the rigorous heat stroke testing performed at the Korey Stringer Institute at the University

of Connecticut, the foremost heat stroke authority in the United States. The physical demands for a soldier are no less than those experienced by a football player, and there is no valid medical or scientific reason why Gavin should not be allowed to return to the gridiron and realize his dream of playing NCAA Division I football at Towson University. Quite simply, Gavin is asking the Court to let him play football.

## FACTUAL BACKGROUND

In August 2013, while practicing for the upcoming football season with the Towson University ("Towson") football team, Plaintiff Gavin Class suffered a devastating exertional heat stroke that resulted in a weakened health condition that has kept him from fully participating on the Towson football team for two years. After a long and challenging recovery period – during which Gavin went from being unable to stand or walk to running 5K road races – Gavin has now been fully cleared by his liver transplant doctors at the University of Maryland Medical Center ("UMMC") and the heat stroke doctors at the Korey Stringer Institute ("KSI") at the University of Connecticut, *after passing a rigorous testing regimen*, to return to Towson's football program. Instead of embracing this amazing story of courage in the face of adversity, however, Towson has refused, without any reasonable medical basis or explanation, to clear Gavin to fully participate in Towson's football program. Rather than relying on comprehensive medical testing or extensive analysis or examination of Gavin's current physical condition, Towson's decision is based on false stereotypes and inaccurate medical beliefs – in essence, Towson has concluded that it is not possible for a football player who suffers a heat stroke to ever play football again because of the substantial likelihood that the player will suffer another heat stroke.

2

The sobering reality is that Towson's medical conclusions are based on precisely the type of stereotypical and biased beliefs that the Americans with Disabilities Act ("ADA") and Rehabilitation Act were intended to prevent from being used to discriminate against persons who either are not disabled, or are able to perform their duties (in this case, play football) with reasonable accommodations. Towson's position might be defensible if Gavin had not been cleared to return to football by his treating physicians at the UMMC and by the heat stroke experts at KSI – which subjected Gavin to the same rigorous testing that the United States Military uses to clear members to return to active duty after they suffer a heat stroke – but Towson cannot simply preclude Gavin from participating in its football program because of its paternalistic desire to protect Gavin against irrational and unsubstantiated fears. Considering that Towson never even examined or tested Gavin, Towson has no reasonable medical basis for reaching such a conclusion.

As Gavin will demonstrate, through his own testimony and the testimony of his treating physicians and expert witness, the overwhelming medical evidence demonstrates that he is fully able to play football and is at no greater risk of suffering a heat stroke than any other player on the field. For these reasons, and as set forth herein, Gavin requests, pursuant to Rule 65 of the Federal Rules of Civil Procedure, that the Court grant his Motion for Preliminary Injunction requiring Defendant Towson University to allow Gavin to fully participate in the Towson football program, and states as follows:

## RELEVANT FACTS

### Gavin's Stellar Football Background And Tragic Collapse

Gavin attended St. Paul's School in Brooklandville, Maryland, where he was the captain of the football team and was named its Most Valuable Player. [1] After graduation in 2010, Gavin spent two years playing football as an offensive linesman for the University of Rochester, starring as a starter in only his sophomore year, when he was named Honorable Mention All-Liberty League player. Eager to move up to a Division 1 school, Gavin transferred to Towson in 2012 and was redshirted, *i.e.* was not allowed to play during the 2012 football season.

On August 10, 2013, Gavin played starting right guard for Towson in an intrasquad scrimmage in preparation for the 2013 football season – his junior season. Two days later, on August 12, 2013, Gavin collapsed from exertional heat stroke while running sprints with other linesmen near the end of practice at Johnny Unitas Stadium. He was unable to run, walk or stand. The temperature on that day was approximately 91 degrees, with 37% humidity, and a heat index of 102 degrees, and Gavin's body temperature was estimated at 111 degrees on the field – it was 108 degrees when he arrived at the hospital. Gavin was transported to St. Joseph Medical Center and, within twenty four hours, with his liver failing, he was transferred to the University of Maryland Medical Center ("UMMC"), Maryland Shock Trauma Center, where he was in a coma for nine days as he endured a liver transplant and several surgical procedures. At

---

[1] The facts set forth herein are sworn to in the Affidavit of Gavin Class ("Class Affidavit"), attached hereto as Exhibit 1, the Affidavit of Dr. Douglas Casa ("Casa Affidavit"), attached hereto as Exhibit 2, and the various material documents attached thereto.

the time of his collapse, Gavin was using a prescribed medication, Adderall, which predisposed him to potential exertional heat stroke issues, because Adderall lowers the body's resistance to heat.

## Gavin's Remarkable Physical Recovery

After nearly two months, Gavin was released from the hospital and began a slow and grueling recovery process with a single goal in mind – to become the first person to come back from exertional heatstroke and a liver transplant to play football. In the beginning, like a player recovering from reconstructive knee surgery, Gavin could barely stand for ten seconds and was unable to walk from his home to the mailbox, but through intensive physical therapy and training, Gavin slowly recovered and fully regained his skills and strength. In January 2014, Gavin resumed his classes at Towson, and on January 5, 2014, Gavin attended the Towson football team's Football Championship Subdivision Title game in Frisco, Texas, where he addressed the team and told them that he had died, for a while, but that God had brought him back to be a part of the team's year.

During the next year, Gavin devoted himself to building his mental and physical strength so that he would be able to compete for the Towson football team during the 2015 season. By September 2014, Gavin was running 5K runs and engaging in non-contact drills in preparation for obtaining his reinstatement to the Towson football team for the 2015 football season. In January 2015, the Baltimore Sun picked Gavin as one of ten athletes to watch during 2015, and in November 2014, the Baltimore Sun quoted Rob Ambrose, Towson's Head Football Coach, as stating, "Gavin might be the toughest damn kid I've ever seen. . . . Will he come back? I believe

he will. Should he come back? If for no other reason than to put on his helmet one more time, for one more play. He'll do it for validation."

As a result of his exertional heat stroke, Gavin suffered a physical impairment, exertional heat stroke, which can potentially reduce his ability to regulate body heat. On February 6, 2015, Gavin underwent a rigorous heat tolerance testing regimen at KSI, where the faculty are renowned for their research and expertise in the areas of heat and hydration, injury prevention and strength conditioning. The heat tolerance testing at KSI – used by the United States Military and numerous large employers to determine a safe return to activity or work – takes place in an environmental chamber set to 104° with 40% humidity, where Gavin exercised for two hours to observe how his body reacts to the heat. Based on measures of heart rate and rectal temperature after the two-hour test, KSI determined that Gavin "successfully demonstrated the ability to thermoregulate as expected at this intensity in these conditions. It is encouraging to see that you were able to handle the heat tolerance test given your specific history and timeline of events." Gavin provided a copy of KSI's report to Towson so that it would be aware that Gavin had been cleared by nationally-recognized experts to play football.

In addition, Dr. Douglas Casa, the nation's foremost expert on heat stroke, who directs KSI, has successfully treated more than 185 cases of exertional heat stroke and has published more than 175 peer-reviewed publications relating to exertional heat stroke, heat-related illnesses, hydration and preventing sudden death in sport – and is familiar with Gavin's medical history and testing – has concluded that, in his professional opinion, "Mr. Class can safely return to full participation in the football program at Towson, subject to several recommendations to

6

ensure his optimal safety on the field." Dr. Casa also pointed out, in reference to Towson's stated reasons for refusing to allow Gavin to fully participate in Towson's football program, that "I do not agree with this conclusion and am not aware of any medical research that suggests that once an athlete suffers an exertional heat stroke, they are always at a high risk for suffering another exertional heat stroke, particularly in light of the various preventative and safety protocols outlined above."

Moreover, with regards to his liver transplant, on January 9, 2015, Gavin's medical providers at UMMC, including Dr. Rolf N. Barth, Surgical Director of Liver Transplantation, and Dr. William Hutson, Medical Director of Liver Transplantation, stated that, "The Liver Transplant Team at the University of Maryland Medical Center has reviewed Gavin Class' medical history and current medical condition and concluded that he is at acceptable risk to play collegiate level football. We believe with appropriate abdominal padding and protection . . . he will be at extremely low risk for complications. We would further recommend temperature monitoring and continued compliance with his anti-rejection medications. These therapies should not interfere in any way with his ability to participate in collegiate sports."

### Towson's Refusal To Allow Gavin To Participate In Towson's Football Program

Based on the fact that Gavin was cleared to return to football by his treating physicians, and considering that he had fully healed from his previous heat stroke – a fact confirmed when he passed the widely recognized and rigorous Heat Tolerance test administered by KSI, the same test used to clear members of the military to return to service – Gavin decided that he wanted to finish his football career by fully participating on the Towson football team for his senior year.

7

In reaching this decision, Gavin also took into account the fact that, in the wake of his collapse, Towson has taken significant steps to revamp its' practice and training regimen to greatly improve safety and prevent any future incidents of heatstroke. For example, Towson's practice and training now encompasses numerous rest periods, and the players are required to remove their helmets when running sprints to let the heat escape. It is also mandatory for players to sit in cold tubs for seven to ten minutes after practice, and the team has added a "slushie" machine to keep the core temperatures of the football players down during practice.

In addition, Gavin no longer is using Adderall or any other prescription drug that would increase his susceptibility to heat stroke. He does not have any of the other common traits that would predispose a person to heat strokes, such as a heart condition, lung disease, diabetes or obesity, nor does he use alcohol or smoke, and he is not elderly or pre-pubescent. Finally, Gavin's doctors and the experts who tested him at KSI recommended certain protocols that they believed Gavin should observe in returning to football to minimize any risk of future heat stroke. For example, Gavin can use medical system that monitors his core body temperature with a pill containing a computer chip that would allow the Towson football team staff to wave a monitor in front of Gavin to obtain an instant reading of his core body temperature. In addition, the experts at KSI who tested Gavin recommended that: a) he follow a heat acclimatization protocol during the Spring; b) increase and monitor his fluid intake during practices and scrimmages; c) gradually increase the duration and frequency of workouts in the heat over the course of 2-4 weeks; and d) monitor his body temperature especially in warm to hot environments, including specifically the first two weeks of pre-season workouts in August. These recommendations constitute reasonable

8

accommodations which could be performed by Towson with minimal cost or disruption to the football program.

On March 19, 2015, Gavin's attorneys requested that Towson allow Gavin to fully participate in Towson's football program for the 2015 football season and provide reasonable accommodations that would fully allow Gavin to play football. On May 4, 2015, however, Towson sent a letter to counsel for Gavin stating that "while Gavin has made admirable strides in his recovery, he is unable to return to playing football safely and that no reasonable accommodation can be made to adequately protect him from potentially devastating health effects." In that letter, Towson stated that while they believed that Gavin's liver transplant did not preclude him from returning to the football program, they would not allow him to play football because he had suffered a heat stroke, and they believed that he is susceptible to having another heat stroke. Specifically, Towson stated that while they "acknowledge that the medical providers at the University of Maryland believe Gavin's liver transplant is not an impediment to returning to football so long as certain precautions are taken . . . Gavin's risk of another heat stroke . . . is another matter. . . The sports medicine professionals believe that the risk of serious injury or death as a result of another heat stroke is too great to clear Gavin to play." Towson concluded by noting that "Gavin's risk of heat stroke is not capable of adequate prevention with any reasonable restriction or accommodation."

At no point did Towson communicate with Gavin the reasons why they believe that no reasonable accommodation can be made to allow Gavin to play football, conduct any examination or testing of Gavin, or engage in any interactive process with Gavin regarding his

9

ability to play football or the possibility that Towson could provide reasonable accommodations to reduce the risk of heat stroke and allow him to play football. Towson's 2015 football season starts with practice sessions on August 1, 2015, and their first football game is on September 5, 2015 at East Carolina University.

## **ARGUMENT**

### I.    **Gavin Satisfies The Requirements For Issuance Of A Preliminary Injunction.**

The ADA and the Rehabilitation Act authorize injunctive relief to remedy acts of discrimination against persons with disabilities or persons regarded as having disabilities. *See* 42 U.S.C. § 12188(a)(1) and 29 U.S.C. § 794a. To obtain a preliminary injunction, Gavin must demonstrate that: a) he is likely to succeed on the merits; b) he is likely to suffer irreparable harm if preliminary injunctive relief is denied; c) the balance of equities tips in his favor; and d) a preliminary injunction is in the public interest. *See W. Va. Ass'n. of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Circuit 2009).

### A.    **Gavin Demonstrates A Reasonable Likelihood Of Success On The Merits.**

The ADA and Rehabilitation Act provide that no qualified person shall, by reason of a disability or a perceived disability, be excluded from participation in or be denied the benefits of services, programs or activities of a public entity, or be subjected to discrimination by any such entity. *See* 42 U.S.C. § 12132 and 29 U.S.C. § 794a. As a public university, Towson is legally obligated to provide Gavin with equal access to the football program as is afforded to non-disabled members of its community. To prove a violation of either the ADA or Section 504 of the Rehabilitation Act, Gavin must show that: a) he has a disability; b) he is otherwise qualified

10

to participate in Towson's football program; and c) he was excluded from Towson's football program because of his disability. *See Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474, 498 (4th Cir. 2005).

### 1. Gavin Is Disabled Under The ADA And Rehabilitation Act.

An individual with a disability is defined as one who: a) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; b) has a record of such impairment; or c) is being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B) . The definition of "disabled" must be "construed in favor of broad coverage of individuals" and the term "substantially limits" must be "interpreted consistently with the ADAAA's findings and purposes." 42 U.S.C. § 12102(A) and (B). In this case, there can be no doubt that either Gavin has a physical impairment that substantially limits one or more major life activities or that Gavin was mistakenly regarded as having such a substantially limiting impairment by Towson (when, in fact, he has fully recovered from his heat stroke).

### a) Gavin Has A Physical Impairment That Substantially Limits One or More Major Life Activities (Or Has A Record Of A Disability).

It is undisputed that Gavin suffered a debilitating exertional heat stroke in 2013 that, during the heat stroke and while he was recovering, substantially limited his ability to stand, run, walk and regulate his body temperature – all of which are major life activities. *See* 42 U.S.C. § 12102(2)(A) (listing major life activities); *See also* 42 U.S.C. § 12102(2)(B) (noting that "the operation of a major bodily function, such as respiratory, circulatory and endocrine functions,

also qualifies as a major life activity."). As several courts have noted, the ability to regulate body temperature is a major bodily function that qualifies as a major life activity. *See EEOC v. Agro Distrib. Comm'n,* 555 F.3d 462, 469-71 (5th Cir. 2009) (assuming that inability to control body temperature constitutes a major life activity). *See also Nyrop v. Independent School District No. 11,* 2009 U.S. Dist. LEXIS 29487, *9 (D. Minn. April 7, 2009) ("The court assumes without deciding that sentience in the hands, swallowing and the ability to regulate body temperature are major life activities.").

The parties agree that during Gavin's heat stroke and subsequent recovery, he was substantially limited in these major life activities. The parties disagree about whether Gavin could ever fully recover from a heat stroke. Towson's position appears to be that Gavin is forever and irrevocably substantially limited from such major life activities because he suffered a heat stroke. As such, he is considered by Towson, from a legal viewpoint, to be substantially limited in major life activities. While Gavin believes that he is only substantially limited from major life activities when he actually suffers a heat stroke (and during his subsequent recovery), that belief does not diminish the fact that he is considered, from a legal viewpoint, substantially limited in several major life activities for purposes of demonstrating that he has a disability. *See Harrison-Khatana v. WMATA,* Civil Action No. 8:2011-cv-3715 (D. Md. Jan. 22, 2015) (noting that plaintiff's history of injuries provides evidence that the purported impairments substantially limited a major life activity), *citing Moore v. Marriott Intern., Inc.,* 2014 WL 5581046 at *7 (D. Ariz. Oct. 31, 2014) ("The record includes evidence that Plaintiff has a history of seizures and that she is substantially limited in several major life activities during a seizure."). *See also*

12

*Lapier v. Prince George's County, Maryland,* 2012 U.S. Dist. LEXIS 59496, *21-22 (D. Md. April 27, 2012) (finding that plaintiff demonstrated that she suffered from disability where her impairment, a blood disorder, caused her to lose consciousness on one occasion during training). The ADA expressly takes such conditions into account, extending its coverage to impairments that are episodic in nature – such as Gavin's heat stroke – so long as the impairments "would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

Moreover, a person has a record of a disability if he has "a history of a mental or physical impairment that substantially limits one or more life activities." *See Heisler v. Metro. Council,* 339 F.3d 622, 630 (8th Cir. 2003). Thus, to the extent that Gavin has demonstrated that his heat stroke substantially limited a major life activity, he would be considered disabled under the ADA and Rehabilitation Act. *See Sorenson v. Univ. of Utah Hosp.,* 194 F.3d 1084, 1087 (10th Cir. 1999). Here, it is undisputed that Gavin suffered an exertional heat stroke and was unable to stand, walk, run or regulate his body temperature at that time and during his long recovery period. Thus, Gavin has shown that he has a record of a physical impairment sufficient to constitute a disability.

### b) <u>Towson Regarded Gavin As Being Disabled.</u>

Alternatively, even if the Court concludes that Gavin is not currently substantially limited from any major life activities, it is apparent that Towson regards Gavin as disabled because it contends that he has a physical impairment that substantially limits a major life activity, *i.e.* regulation of body temperature, and is therefore unable to control his body temperature and subject to a high risk of future exertional heat strokes. *See Quarles v. Maryland Dep't of Human*

13

*Resources,* Civ. Action No. MJG-13-3553 (D. Md. Dec. 5, 2014) (setting forth standard for

proving "regarded as" disability discrimination claim) (*quoting Rhoads v. F.D.I.C.,* 257 F.3d

373, 390-91 (4ᵗʰ Cir. 2001)). In such instances, the Fourth Circuit has pointed out that the

"analysis focuses on the reactions and perceptions of the . . . decisionmakers." *Wilson v. Phoenix*

*Specialty Mfg., Co.,* 513 F.3d 378, 384-85 (4ᵗʰ Cir. 2008). In addition, the decisionmaker must

have "a misperception; it must believe . . . that an individual has a substantially limiting

impairment when, in fact, the impairment is not so limiting." *Stukes v. Locke,* 2012 WL 5829066

at *3 (D. Md. Nov. 15, 2012).

Here, Towson's misguided position can be clearly gleaned from the text of Towson's

letter, dated May 4, 2015, in which Towson expressly refused to allow Gavin to participate in the

football program because of his *history* of exertional heat stroke and their belief that "Gavin's

risk of another heat stroke . . . is another matter. . . The sports medicine professionals believe that

the risk of serious injury or death as a result of another heat stroke is too great to clear Gavin to

play. . . Gavin's risk of heat stroke is not capable of adequate prevention with any reasonable

restriction or accommodation." It is rare that such a clear statement of the underlying reasoning

of a decision maker exists, but Towson's letter clearly demonstrates that Towson mistakenly

believes Gavin has a physical impairment or record of physical impairment, *i.e.*, exertional heat

stroke, that substantially limits the major life activity of regulating body temperature. Such a

misperception is belied and undercut by the testimony and documentation presented herein from

Gavin's treating physicians at UMMC and the heat stroke experts at KSI.

In many ways, the present case is quite similar to the factual scenario recently addressed

14

by this Court in *Williams v. Baltimore City Community College,* Civ. Action No. GLR-12-238 (D. Md. Sept. 23, 2014), where the Court found that BCCC regarded plaintiff as disabled where the decision maker concluded that plaintiff's symptoms limited her vision such that she could not return to work. The Court pointed out that while the plaintiff, like Gavin, was clearly disabled before and shortly after she underwent surgery, Plaintiff's doctors believed that she was fully capable of performing the essential functions of the position after she had recovered from the surgery – just like Gavin's doctors believe he is fully capable of participating in Towson's football program in light of his recovery. The Court concluded that BCCC's reliance on their own doctor's conclusions, and unjustified discounting of plaintiff's treating doctor's conclusions, supported a conclusion that BCCC regarded plaintiff as disabled. *See also Wilson v. Phoenix Specialty Mfg., Co.,* 513 F.3d 378, 385 (4th Cir. 2008) (finding defendant regarded plaintiff as disabled where defendant ignored the opinion of the plaintiff's doctor in favor of its own); *Bennett v. Kaiser Permanente,* 931 F. Supp.2d 697, 711-12 (D. Md. March 20, 2013) (finding that where plaintiff and her doctor believed that she was no longer impaired, decision maker's decision to remove plaintiff from position because of the previous impairment suggested that plaintiff was regarded as disabled).

This case is also strikingly similar to this Court's opinion in *Lapier v. Prince George's County, Maryland,* 2012 U.S. Dist. LEXIS 59496, *21-22 (D. Md. April 27, 2012), where the plaintiff, a police officer in training, passed out during a training run and was later diagnosed with a chronic blood disorder, which can, at times, decrease blood oxygen levels. The Court found that even though the blood disorder did not affect Mr. Lapier on a daily basis, the fact that

it caused him to pass out on one occasion and could cause similar problems in the future was sufficient to demonstrate that he suffered from a disability, noting: "it is plausible that Plaintiff's blood disorder limits his ability to engage in major life activities (e.g., breathing) compared to most people in the general population. Anything less would make a mockery of the ADAAA's mandate that "the definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* at \*22. The Court further found that because the County refused to allow Mr. Lapier to continue participating in the police training program because he passed out, he was "regarded as disabled" by the County. *Id.* at \* 23.

## 2. Gavin Is Qualified To Participate In Towson's Football Program.

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the position that such individual holds or desires." *See* 42 U.S.C. § 12111(8). The Supreme Court has interpreted this provision to mean that a person may be a "qualified individual" even if he can only perform the essential functions of the position only with reasonable accommodations. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 393 (2002).

In 2012, Gavin was invited to join Towson's football program, and he quickly demonstrated that he was able to perform the duties of a football player at a high level of performance, as demonstrated by his starting position and his recognition by the Baltimore Sun and Towson's football coach. Moreover, his treating doctors and KSI believe that there is no reason that Gavin cannot participate in the Towson football program by taking several basic

preventative steps and following simple protocols to ensure his safety. Thus, with or without reasonable accommodations, there is no doubt Gavin can perform the essential functions needed to participate in Towson's football program.

### 3. Gavin Was Excluded From Towson's Football Program Because Of His Disability (Or Because He Was Regarded As Being Disabled).

Towson's decision not to allow Gavin to participate in Towson's football program was based – in Towson's own words – wholly on the belief that "Gavin's risk of heat stroke is not capable of adequate prevention with any reasonable restriction or accommodation." Thus, either a) Towson decided – without even attempting to engage in the required interactive accommodation process – that Gavin could not be accommodated and should be excluded from the football program because of his perceived disability; or b) Towson regarded Gavin as suffering from a disability which prevented him from ever safely participating in the football program and therefore excluded him from participating in the football program. In either event, Gavin has demonstrated that he was discriminated against based on disability.

In the first instance, to prove a failure to accommodate claim, Gavin must show not only that he is disabled and that Towson knew of his disability, but that he could perform the essential functions of playing football with reasonable accommodations, and that Towson refused to make the accommodations. *See Wilson v. Dollar General Corp.*, 717 F.3rd 337, 344 (4th Cir. 2013). Gavin has presented evidence and testimony demonstrating that, by taking several simple preventative steps and following several basic protocols, he can safely perform his duties as a football player for the Towson football program. For example, by: a) following a heat

acclimatization protocol during the Spring; b) increasing and monitoring his fluid intake during practices and scrimmages; c) gradually increasing the duration and frequency of his workouts in the heat over the course of 2-4 weeks; and d) monitoring his body temperature especially in warm to hot environments, including specifically the first two weeks of pre-season workouts in August, and by continuing compliance with his anti-rejection medications, Gavin would be able to fully participate in Towson's football program. Whether such basic preventative steps and simple protocols even qualify as reasonable accommodations is irrelevant, because Gavin could perform the duties required to participate in Towson's football program in either instance.

Towson has failed to explain to Gavin why it believes it is unable to provide such reasonable accommodations, or why it believes that such reasonable accommodations are insufficient to allow Gavin to participate in the football program. Moreover, Towson has failed to explain why it failed to engage in the required interactive process with Gavin. *See Harrison-Khatana v. WMATA,* Civil Action No. 8:2011-cv-3715 (D. Md. Jan. 22, 2015) (finding that the parties had a "responsibility to engage in the interactive process" to determine an appropriate accommodation) (*citing Haneke v. Mid-Atlantic Capital Management,* 131 F.App'x 399, 400 (4th Cir. 2005) ("Implicit in the fourth element is the requirement that the [parties] engage in an interactive process to identify a reasonable accommodation."). As the Fourth Circuit recently noted, liability for failure to engage in the interactive process depends upon a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would have allowed the plaintiff to perform the essential functions of the position. *See Summers v. Altarium Inst. Corp.,* 740 F.3d 325, 331 (2014).

18

In the second instance, to prove that Towson regarded him as disabled and therefore refused to allow him to participate in the Towson football program, Gavin must demonstrate that he was "subjected to an action prohibited (by the ADA) because of an actual or perceived physical. . . impairment whether or not the impairment limits or is perceived to limit a major life activity." *Johnson v. Sectek, Inc.*, 2015 U.S. Dist. LEXIS 13174 (D. Md. Feb. 4, 2015) (quoting 42 U.S.C. § 12102(3)). In this instance, Towson expressly decided that Gavin cannot participate in the football program because of an actual or perceived physical impairment, *i.e.*, his previous heatstroke which allegedly limits his ability to regulate his body temperature.

**B.    Gavin Will Suffer Irreparable Harm If Towson Does Not Allow Him To Fully Participate In Towson's Football Program.**

If Gavin is not reinstated to the Towson football team and allowed to fully participate in the football program, he will forever lose the ability to participate in an important educational opportunity – playing football for a NCAA Division I football team. The harm caused by his inability to play football is irreparable, because Gavin has spent many years preparing and training to play Division I college football, and there are no further opportunities for him to play college football once his eligibility has expired. His lifelong pursuit of playing football for a Division I football team would be thwarted, and he would lose a unique educational opportunity. There can be no doubt that this would be a permanent harm that cannot be rectified by monetary damages.

Irreparable harm may be presumed when a defendant has violated a civil rights statute such as the ADA or the Rehabilitation Act. *See Pathways Psychosocial v. Town of*

*Leonardstown,* 223 F. Supp.2d 699, 717 (D. Md. 2002) (*citing Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 827 (9th Cir. 2001)). This is especially true when that statute, such as the ADA and Rehabilitation Act, explicitly provides for injunctive relief. *Id.* (*citing Burlington Northern R.R. Co. v. Dep't of Revenue,* 934 F.2d 1064, 1074 (9th Cir. 2001)). Moreover, the Fourth Circuit has held that a delay in the ability to pursue employment opportunities constitutes irreparable injury – in the same way that a delay in the ability to participate in the Towson football program constitutes irreparable injury. *See Jones v. Board of Governors of the University of North Carolina,* 704 F.2d 713, 716 (4th Cir. 1983) ("As the district court concluded, without a preliminary injunction, Jones will obviously suffer irreparable injury: she will be barred from taking courses during the spring semester, delaying the time at which her ability to work as a nurse will come to fruition; she will have a gap in her education which she will have to explain throughout her professional life; and she will be deprived of the opportunity to complete her education with her fellow classmates.")

Towson's refusal to clear Gavin to fully participate in the Towson football program is the same as barring him from taking courses for a semester – except in this case, the irreparable harm is even more substantial than in *Jones*, because Gavin is being forever barred from playing football at Towson. There is only one football team at Towson, so Gavin is being barred from playing football in college and would have a gap on his sports resume. Such a gap could have devastating effects on any possibility that he might have of playing professional football after graduation. Moreover, he will be deprived of the opportunity to develop lifelong friendships and play football with many of his fellow players. Finally, his inability to play football this year

20

would severely impact his ability to play football team during the 2016 season – football is highly competitive, and an exclusion by Towson would likely reverberate throughout his football career. Towson's refusal to allow Gavin to fully participate in the Towson football program is precisely the type of "actual and imminent" irreparable harm which cannot be cured by monetary damages that injunctive relief is intended to prevent. *See Direr Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991) (noting irreparable harm must be "neither remote nor speculative, but actual and imminent"); *Multi-Channel TV Cable Guide v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir. 1994) ("irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate").

C.      **The Balance Of Equities Tips In Gavin's Favor Because Towson University Will Suffer Minimal, If Any, Harm From The Issuance Of Injunctive Relief.**

While it is apparent that Gavin would suffer irreparable injury in the absence of an injunction, the harm that any injunction would cause Towson is negligible. Gavin has made clear to Towson that he is willing to sign a binding waiver of any liability on behalf of Towson in the event that he suffers another heat stroke or related medical issues while participating in the Towson football program. Moreover, Gavin has also offered to pay for the minimal costs of any of the basic preventative protocols and steps that his doctors have recommended as a way of ameliorating any potential medical risks that Gavin might experience playing football. Thus, there are no monetary costs or risks for Towson in the event that the Court grants a preliminary injunction.

**D.**     **The Public Interest Favors Issuance Of A Preliminary Injunction.**

Finally, considering that there are no monetary costs or risks that would be incurred by the public by allowing Gavin to fully participate in Towson's football program – even if he were to suffer a medical issue – it is difficult to imagine why the public would not be better served by seeing Gavin's recovery efforts be rewarded by the opportunity to play football for Towson. As Congress has made clear in enacting the ADA and the Rehabilitation Act, the public interest lies in preventing discrimination against persons with disabilities – the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane,* 541 U.S. 509, 516 (2004) (*quoting* 42 U.S.C. § 12101(b)(1)). In the context of preliminary injunctions, courts have found that "the public interest is clearly served by eliminating the discrimination Congress sought to prevent in passing the ADA." *Jones v. City of Monroe,* 341 F.3d 474, 490 (6th Cir. 2003); *See also Agranoff v. Law School Admission Council, Inc.,* 97 F. Supp.2d 86, 88 (D. Mass. 1999) ("the Court has an obvious public interest in providing those with disabilities equal footing."). Consequently, the public interest favors granting preliminary injunctive relief to Gavin.

## CONCLUSION

The experts at KSI, and Gavin's treating physicians at UMMC agree that, by following basic protocols and simply preventative steps, there is no reason that Gavin cannot fully participate in Towson's football program. Towson, however, relying on baseless stereotypes and false assumptions, has decided that it has Gavin's "best interests in mind" and will not reinstate Gavin to the Towson football team – regardless of the well-documented conclusions of his

22

treating physicians and the heat stroke experts at KSI.

Such patronizing, if well-intentioned conclusions, if not reversed by this Court, will cause Gavin to suffer irreparable harm by not being allowed the opportunity to pursue his life's dream – to play Division I college football for Towson. Ultimately, Towson will not suffer significant harm if the Court requires Towson to allow Gavin to fully participate in the Towson football program. For these reasons, and for all of the reasons set forth herein, Gavin requests that the Court grant Plaintiff's Motion for Preliminary Injunction requiring Towson University to allow Gavin to fully participate in Towson's football program.

Dated: May 28, 2015

Respectfully submitted,

_____ /s/ _____ .
Andrew M. Dansicker (11765)
(adansicker@dansickerlaw.com)
Law Office of Andrew M. Dansicker, LLC
11350 McCormick Road
Executive Plaza II, Suite 705
Hunt Valley, Maryland 21031
410-771-5668
443-927-7390 (fax)

*Attorneys for Plaintiff Gavin Class*