IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GAVIN CLASS,                                    *

    Plaintiff,                             *

       v.                                *            Civil Action No. RDB-15-1544

TOWSON UNIVERSITY,                              *

    Defendant.                            *

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM OPINION

On August 12, 2013, Gavin Class suddenly collapsed on the field while practicing as a member of the Towson University football team.  Receiving excellent immediate attention from the training staff of the team, he was rushed to the nearest hospital.  He was moved to the Maryland Shock Trauma Center at the University of Maryland Medical Center where it was determined that he had suffered a heat stroke with liver failure and was facing a life-threatening situation.  Ultimately, he was able to survive by receiving a liver transplant.  After two years of intense medical and physical rehabilitation, he has achieved an amazing recovery.  His doctors, who specialize in liver disease and liver transplants, have cleared him to once again play football.  An expert from the Korey Stringer Institute, the nationally recognized center for the study of heat stroke and heat illness, has also cleared him to return to play.  Gavin Class has overcome almost every obstacle in his return to the football field.  However, he now faces his last hurdle: the opposition of the Towson University team physician, who while qualified in sports medicine for the past five years, has no expertise in liver illness or heat injury.

Class, still a student at the University, has turned to this Court for relief. He contends that the University has discriminatorily refused to provide reasonable accommodations that would allow him to participate in the 2015 football season, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a and the Americans with Disabilities Act, 42 U.S.C. § 12133 ("ADA"). Class seeks an injunction against the University that would allow him to fully participate in Towson University's football program. For the reasons that follow, Judgment will be entered in his favor against Towson University. The University will be permanently enjoined from violating his rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by prohibiting him from participating in the football program as the result of medical concerns related to his status as a transplant recipient and heat stroke victim. The University shall be ordered to permit him to return to active status as a full participant in its football program.[1]

I.      FACTUAL AND PROCEDURAL BACKGROUND

Class filed the present action on May 28, 2015, alleging that Towson University has refused to clear him to play football in the upcoming season or to make any "reasonable accommodations" that would permit him to return to full participation. *See* Pl.'s Compl., ECF No. 1. He claims that by refusing to make such accommodations, Towson University is in violation of the Americans with Disabilities Act, 42 U.S.C. § 12133 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a. Specifically, as the Plaintiff in this action, he levies three claims. First, he alleges that the University has excluded him from fully participating in

---

[1] During a hearing before this Court, counsel for Towson University has alluded to the fact that Class must obtain a waiver from the National Collegiate Athletic Association ("NCAA") because of the length of time that he has been a college student. This Court expressly does not address the issue of NCAA eligibility rulings unrelated to his medical condition.

the football program solely because of his disability, thereby excluding him from participating in, denying him the benefits of, and otherwise discriminating against him in its facilities, services, programs or activities in violation of the Rehabilitation Act (Count I). *Id.* ¶¶ 34–45. Second, he asserts that the Towson has failed to meet its obligations to provide him with equal opportunities as other students without disabilities by excluding him from the football team and denying him the benefits of, and otherwise discriminating against him in its facilities, services, programs and activities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12133 (Count II).[2] *Id.* ¶¶ 46–57. Along with his Complaint, Class also filed a Motion for Preliminary Injunction (ECF No. 2).

This Court held a scheduling teleconference on June 11, 2015. During that call, the University indicated that it intended to file a motion to dismiss addressing some of the legal issues presented by Class' claims. The parties also agreed that an expedited schedule was preferable as the University's football team usually begins practice in early August. Accordingly, the Court established a briefing schedule and set in a hearing on the Motion to Dismiss for June 30, 2015. Additionally, by agreement of the parties, this Court ordered that Plaintiff's Motion for Preliminary Injunction (ECF No. 2) be treated as a Motion for a Permanent Injunction consistent with the Complaint and merits of this case. *See* Order dated June 11, 2015, ECF No. 9. Finally, the Court scheduled an evidentiary hearing on the merits for July 14, 2015 to determine whether a permanent injunction was warranted.

---

[2] Class' Complaint also includes a third claim raising the alternative argument that he has been discriminated against on the basis of the fact that he has been "regarded as" disabled under § 12102(1)(C) by the University. As explained *infra*, this Court finds that Plaintiff is both disabled for purposes of the ADA and has a record of such disability; accordingly, there is no basis for such a finding in Plaintiff's favor on his third claim.

At the June 30, 2015 hearing on the Motion to Dismiss, this Court entertained arguments about the legal merits of Class' substantive claims.  After considering the parties' presentations, this Court denied the Motion to Dismiss (ECF No. 11) for reasons stated on the record in open court.  *See* Order dated June 30, 2015, ECF No. 21.  Accordingly, this Court conducted a one-day hearing—akin to a bench trial—on July 14, 2015 to determine whether Class was entitled to a permanent injunction under the ADA and Rehabilitation Act.

## II.  FINDINGS OF FACT

### A. Class' Exertional Heat Stroke and Subsequent Medical Procedures

During a Towson University football practice on August 12, 2013, Gavin Class suddenly collapsed on the field during conditioning drills.  The athletic training staff on the field quickly submerged him in cold water and dialed 911.  Class was rushed to the hospital where he was diagnosed with exertional heat stroke and was observed to have a variety of medical complications including liver failure.  Class was ultimately stabilized long enough to obtain a liver donor and receive a liver transplant.

Class' recovery from the transplant operation was hindered by several complications.  Class suffered from bleeding and an infection after the surgery, and he also has a defect in his abdominal wall.  Additionally, Class suffered from post-transplant lympohoproliferative disease, which is a complication of organ transplantation that involves the growth of precancerous, abnormal cells.

Due to the severity of both his original illness and subsequent complications, Class' rehabilitation was a long and arduous process.  He was unable to stand on his own until

several weeks into his hospital stay, and he was only able to remain on his feet for a matter of seconds. By the time he returned home (about six weeks after his initial hospitalization), Gavin Class was able to move around his house using a walker. He eventually transitioned to a cane, then to some unassisted walking. By December of 2013, he was able to perform some light jogging. He began other rehabilitation work, including light lifting and banded exercises, and in the spring of 2014, he began running and footwork drills with a personal strength coach. By October of 2014, he was lifting and running with the University's strength coach. In short, this young man was making a remarkable recovery.

Dr. William Hutson, a recognized expert in liver disease and liver transplant, oversaw Class' care at the University of Maryland Medical Center. Dr. Hutson continues to see him every three months as part of his continuing care. Dr. Hutson testified that Gavin Class has had an amazing recovery and that he is able to return to playing football. Dr. Hutson has recommended, however, that Class wear a protective padding to protect his abdominal wall.[3]

## B. Testing for Thermo-Regulation by the Korey Stringer Institute

The Korey Stringer Institute ("the Institute") at the University of Connecticut was founded in the wake of the death of Korey Stringer, a football player in the National Football League who died after suffering a heat stroke. The Institute researches issues related to heat stroke and heat illness and conducts educational and advocacy activities around the country. The NFL remains a corporate partner with the Institute, which has

---

[3] Class has obtained the recommended padding, which covers his left side and back. The padding was introduced as Plaintiff's Exhibit 5 at trial. Class wore the padding while participating (apparently on a limited basis) in the University's spring practices. The testimony at trial indicated that extra padding is not uncommon for football players who have or are returning from various injuries.

worked with a number of sports teams and athletic programs as well as the United States military with respect to heat illness issues.  Additionally, the Institute also provides testing services, including heat testing services testing for individuals recovering from heat stroke or heat illness.

According to the testimony of the Institute's Chief Operating Officer, Dr. Douglas Casa, the Institute was first contacted about Class' case by an athletic trainer at the University during Class' rehabilitation process.  Over the span of several months, the Institute conducted several Heat Tolerance Tests on Class to evaluate his ability to thermo-regulate (i.e., his body's ability to self-regulate its temperature during exertion) which were paid for by the University.

The first test was conducted in August of 2014.  The test required that Class walk for 120 minutes in 104-degree heat with 40% humidity while maintaining a rectal temperature of 38.5-degrees Celsius (or 101.3-degrees Fahrenheit) or lower and a heart rate of less than 155 beats per minute.  This first test, however, was cut short after about 70 minutes due to the fact that Class' temperature exceeded the permissible threshold.  *See* Def.'s Ex. 2.

Class retook the test in February of 2015.  During the February test, Class' body effectively thermo-regulated under the test conditions, demonstrating that Class was "able to sustain low intensity exercise in a hot environment for 120 minutes."  Pl.'s Ex. 3; Def.'s Ex. 2; *see id.* ("Based on your measures of heart rate and rectal temperature in your current level of fitness, you successfully demonstrated the ability to thermoregulate as expected at this intensity in these conditions.").  Additionally, the test summary report suggested that Class initially "only exercise in cool environments ranging from low to high intensity (including

football practices), and only low to moderate intensity in warmer environments." *Id.* The

report also recommended further testing before any "intense conditioning that is done in a

warm to hot environment." *Id.* Finally, the report contained precautionary suggestions:

1) Perform low to high intensity exercise in cool environments
2) The introduction of workouts performed in the heat should gradually work up in duration and frequency over the course of 2-4 weeks, following a specific heat acclimatization program. This is standard policy for any introduction of athletes to exercise in the heat.
3) Ideally, we would suggest you monitor your body temperature when performing new/unique exercise or conditioning sessions, especially when done in warm to hot environments.  This may represent a total of 3-4 weeks of the year (i.e. the first 1-2 weeks of spring football and the first 1-2 weeks of pre-season in August), as these are generally the riskiest times of the year for heat illness.  Monitoring would help to guarantee that your participation is safe and confirm that there is no need for exercise modification.
4) It is important to continue to monitor your fluid needs, as they will increase with warm weather exposure and an increase in your fitness.  Matching your fluid losses as you did in this test will be a great tool to help regulate your temperature during exercise.
5) All exercise progression should be done at the discretion and direct observation of a medical professional.  It is always important to monitor athletes for signs and symptoms of illness and modify practices based on extreme weather conditions.

*Id.*

Class underwent a third, highly rigorous test in June of 2015.  The test involved

running in 104-degree heat and 40% humidity; in order to pass, he needed to maintain a

body temperature of 39.5-degrees Celsius (103.1-degree Fahrenheit) or lower while running

1.6 miles in nineteen minutes.  *See* Pl.'s Ex. 3; Def.'s Ex. 2.  Dr. Casa of the Institute

described Class' results as "stellar" at the hearing.  Class ran 4.25 miles over a period of fifty

minutes.  *See id.*  The test summary report states that Class "demonstrated the ability to

thermoregulate as expected." *Id.* As before, the report also included recommendations about Class' future activities:

> At this point we suggest that you continue to participate fully in summer conditioning workouts and fully participate with regularly scheduled football practices given the suggestions summarized below:
>
> 1. **Continue to perform conditioning workouts outside** in order to maintain heat acclimatization status.
> 2. **Continue to follow the mandated NCAA heat acclimatization guidelines** for any introduction of equipment, as these will help slowly introduce and progress you to the next and last progression step for return to play, which is exercise in the heat with protective equipment.
> 3. **Monitor your body temperature when performing new/unique exercise or conditioning sessions**, especially when done in warm to hot environments. This may represent a total of 3-4 weeks of the year (i.e. the first 1-2 weeks of spring football and the first 1-2 weeks of pre-season in August when new exercise sessions or equipment is introduced), as these are generally the riskiest times of the year for heat illness. Monitoring would help to guarantee that your participation is safe and confirm that there is no need for exercise modification.
> 4. **Monitor your fluid needs and match your fluid losses.** Fluid needs will increase with warm weather exposure and with increases in your fitness. Matching your fluid losses as you did in this test will be a great tool to help regulate your temperature during exercise.
> 5. **All exercise progression should be done at the discretion and direct observation of a medical professional.** It is always important to monitor athletes for signs and symptoms of illness, have emergency treatment protocols and equipment ready, and modify practices based on extreme weather conditions.

*Id.*

At the hearing, Dr. Casa testified on behalf of Class and was accepted as a national expert in heat stroke and heat illness in athletes and military personnel. Dr. Casa is a certified athletic trainer and strength and conditioning specialist who has studied and written

about these topics extensively.  He also holds a Ph.D. in Exercise Physiology and consults with the both the National Football League and the United States military on the issues of heat stroke and heat illness.

In light of Class' test results, Dr. Casa offered his expert opinion that, despite Class' previous heat stroke, it was now safe for Class to resume playing football provided that the recommendations from his third test were followed.  Dr. Casa opined that Class had physically recovered from his heat stroke and that the accommodations and recommendations outlined in the report would insure that Class could cease activity before he reached a level where he was in danger of a reoccurrence of heat stroke or heat illness.

### C.  The Core Temp Monitoring System and the Lack of Heat Stroke Risk

Dr. Casa testified that the Core Temp Monitoring System ("the CTM System") would provide an effective way for the University's training staff to monitor Class' internal temperature during football activities.  In order to use the CTM System, an athlete swallows an ingestible thermometer pill before beginning physical activities.  The delay is necessary so that the pill passes from the stomach into the intestines in order to allow for more accurate monitoring once activities commence.  The ingestible pill thermometer emits a radio-wave that communicates the athlete's internal temperature to a hand-held monitor positioned near the athlete.  The monitor operator merely needs to hold the monitor unit near the player for three to five seconds in order to obtain a reading; Dr. Casa testified that the monitoring is unobtrusive and can be performed from behind the athlete.  With respect to football, he testified that the System can easily be used to obtain a reading while the athlete is in a football huddle or waiting to participate in a drill without disrupting or interfering with

football activities.  Indeed, based upon the testimony of Dr. Casa, this Court finds that this process is no more complicated than testing the blood sugar level of a diabetic athlete.  Dr. Casa is not aware of any athlete who has suffered a heat stroke or heat illness while using the CTM System, and there are a number of college football programs that currently employ the System during football practices.

Dr. Casa testified that Class would not have a reoccurrence of heat stroke or heat illness if the Core Temp Monitoring System was used (in conjunction with the other recommendations).  In support of this contention, Dr. Casa pointed out that heat stroke is the result of extended physical exertion in heat.  He testified that an athlete's internal temperature rises slowly over a period of time—usually around one degree every five to ten minutes.  Accordingly, usually forty to sixty minutes of exertion is required before an athlete is likely to suffer from heat stroke or heat illness.  Thus, use of the CTM System would allow trainers and/or medical professionals to assess Class' ability to thermo-regulate during a football practice and, if necessary, remove him from drills if his temperature appeared to be rising unsafely.[4]

### D. Towson's Review of Class' Medical Eligibility and Refusal to Allow Class to Participate in Football Activities

Despite the extraordinary comeback of Gavin Class, the Towson University football team physician has blocked his return to the field.  The University has a "Return to Play Policy" that is communicated to athletes during preseason meetings.  The Return to Play Policy provides that "[a] Towson University Team Physician or his/her designee, in

---

[4] The testimony at the hearing indicated that there is no consensus cut off point at which an internal temperature would become unsafe.  However, Dr. Casa suggested that 103-degrees Fahrenheit might be an appropriate, medically conservative threshold internal temperature during his testimony.

consultation with a Towson University certified athletic trainer, has the final authority in deciding if and when an injured student-athlete may return to practice or competition." Def.'s Ex. 7. The Policy expressly notes that "[a] student-athlete's private physician DOES NOT have any jurisdiction as to the participation status of the student-athlete." *Id.* Dr. Kari Kindschi serves as the Medical Director for Athletics and Head Team Physician for the University; in that role, Dr. Kindschi heads the team of doctors that serve as team physicians to the University's teams. Dr. Kindschi received her medical degree in 2006 and her board certification in sports medicine in 2010. Testimony at the hearing indicated that the ultimate return to play decision is made by Dr. Kindschi and that there is no formal appeal process if Dr. Kindschi determines that an athlete will not be allowed to return to athletic activities.

Dr. Kindschi was notified of Class' original injury soon after the incident and visited him at least once while he was hospitalized. Dr. Kindschi has met with Class and his family on two occasions during his rehabilitation to discuss his return to play. The first meeting occurred in September of 2014 and was intended to explain the procedures for an athlete to return to play and the reasons why Class was not permitted to return to play at that point. According to Dr. Kindschi's testimony, that meeting was cut short by the family.

Dr. Kindschi then performed a physical on Class on October 1, 2014. She noted that he was still taking Adderall at that point.[5] At that time, Dr. Kindschi cleared Class for some non-contact conditioning but refused to clear him for intercollegiate athletic participation.

Dr. Kindschi met again with Class and his family for a second time in early 2015. At that meeting, she informed the family that she and her team had not completed their

---

[5] According to the testimony at trial, Adderall is associated with an increased risk of heat illness.

decision-making process with respect to the return-to-play decision, and she explained that there was additional information that she desired in making a decision on his ability to return to play.  She testified that that Class and his family suggested a deadline of April 30 for her to make her decision.

Ultimately, Dr. Kindschi refused to permit Class to return to football activities despite the view of Dr. Hutson and experts at the Korey Stringer Institute.  She simply felt that it was not safe for Class to do so.[6]  Dr. Kindschi testified that, in coming to that decision, she considered Class' first two Heat Tolerance Test results from the Korey Stringer Institute and consulted with her team of doctors.  Dr. Kindschi only became aware of Class' third, more intensive test results from the Institute on the day of her deposition (which, due to the limited time frame, occurred only a few days before trial).  However, Dr. Kindschi's medical opinion on Class' ability to safely return to football activities remains unchanged.  At the hearing, she indicated that she was not persuaded by the most recent test because it was performed without football equipment and the test summary report did not include the charts and graphs with information on rectal temperature and other indicators that had been included with the previous test summary reports.  Dr. Kindschi expressed concerns about Class' ability to thermo-regulate with the additional padding on her abdomen.  She also indicated that her decision was influenced by the unique nature of Class' case, which involved a complex injury and numerous complications.

---

[6] During the hearing on July 14, 2015, Dr. Kindschi suggested that she consulted with other doctors around the country.  This Court finds that testimony to be insufficient and lacking in foundation.  The University did not present any such experts who had reviewed the medical history of Gavin Class or the reports of Dr. Hutson or the Korey Stringer Institute.  Accordingly, this Court finds as a matter of factual determination that the suggestion in Dr. Kindschi's testimony lacks credibility.

Dr. Kindschi also testified about her concerns with respect to the CTM System. She asserted that use of the system on Class was outside the scope of an athletic trainer. She also expressed concern that the periodic monitoring recommended by Dr. Casa might not be sufficient because Class' health conditions could change rapidly. She also noted that she had some concerns about the accuracy of the CTM System based upon the location of the temperature pill within an athlete's system and complications caused by twice-a-day practices. However, in response to questions from the Court, Dr. Kindschi acknowledged that there are members of the Towson University football team who are diabetic and require monitoring of blood sugar levels.

## E. The University's Athletic Training Department

The University employs twelve certified athletic trainers to care for the athletes of its nineteen varsity athletic teams. Three of those trainers—including Nathan Wilder, the Director of Sports Medicine—are assigned to the football team. Wilder testified that during a typical University football practice the three trainers usually cover different areas of the practice field and monitor the athletes for any signs of injury or illness and treat any injuries that may occur. Additionally, the training staff provides water to the athletes and ensures that the athletes remain hydrated. According to the testimony at trial, a member of the University's training staff is in attendance for every practice and game.

Since Class' injury, the University's training staff has also worked with the football program to modify practice plans to avoid future heat-related injury. In particular, football practices now follow a somewhat cyclical structure in which "install periods"—which involve more teaching/coaching and less intensive physical activity in order to provide the

13

players a rest period—are interspersed with high intensity drills.  Additionally, players may now remove their helmets for conditioning drills and have access to "slushy" drink machines and cold baths after practice.  In response to questions from the Court, Wilder also acknowledged that players suffering from diabetes have their blood sugar levels monitored routinely during football practices.

### F. Use of Protective Padding and the Core Temp Monitoring System as Accommodations for Class

After reviewing the evidence in the record, this Court finds that Class' requested accommodations are reasonable under the facts presented here.  Dr. Hutson testified that a protective pad would be sufficient to protect Class from injury related to his abdominal defect, and he indicated that there was no additional risk to Class' health as a result of his transplant surgery that would arise from playing football.

Similarly, Dr. Casa's testimony established that the Core Temp Monitoring System is effective in preventing heat stroke and heat illness—testimony that this Court finds to be persuasive due to Dr. Casa's expertise in the areas of heat illness and heat stroke.  Moreover, the Court does not find that Dr. Kindschi's testimony with respect to the CTM System to be particularly credible.  Dr. Kindschi was certified as an expert in Sports Medicine generally, not as an expert on heat illness in athletes.

Moreover, Dr. Kindschi's concerns about a sudden and dramatic change in Class' condition are unsupported by any evidence in the record at least with respect to heat stroke and thermo-regulation.  Dr. Casa's testimony established that athletes' temperatures rise slowly over a period of exertion, and the CTM System is effective in determining when an athlete's temperature is approaching a dangerous range with intermittent monitoring.

### G. The Burden Imposed upon the University by Class' Requested Accommodations

Class requests that the University accommodate him by providing the recommendations in the Korey Stringer Institute's Test Summary Reports. As the testimony of Nathan Wilder, Director of Sports Medicine, indicated, the University already provides athletic trainers (i.e., medical professionals) at training sessions and practices, monitors the hydration and fluid intake of athletes, and follows the NCAA-mandated heat acclimatization schedule as part of its standard practices. Accordingly, the only accommodations that may conceivably burden the University are related to the use of additional equipment.[7]

With respect to the protective padding that Class seeks to wear to protect his abdomen, it is clear that there is no burden on the University whatsoever. Class has already obtained the padding and there is no evidence of any further costs to be incurred by the University.

Similarly, the use of the CTM System under the circumstances of this case will not impose an undue burden on the University. Dr. Casa has recommended that the system be used to check Class' temperature every five to ten minutes during football activities. The cost of obtaining the CTM System monitor and pills will be covered by Class and his family.

---

[7] Tim Leonard, the Athletic Director at the University, expressed concerns about team focus and morale arising from the accommodations requested by Class during his testimony. There is no basis to find that these "concerns" would constitute an undue burden on the University. There was no testimony, expert or otherwise, to support the existence of such effects on the team. Moreover, the testimony at trial indicated that the University's decision to prohibit Class from participating was based solely on Dr. Kindschi's medical determination.

Accordingly, the University has not presented any evidence to indicate a financial burden created by the use of CTM System.[8]

Additionally, the Korey Stringer Institute has offered to monitor the first two weeks of football activities in order to perform the monitoring of Class during that period.[9]  Thus, at least for the initial use of the Core Temp Monitoring System, there is no administrative burden placed upon the University's athletic training staff whatsoever.[10]  Moreover, while Wilder suggested that using the System to monitor Class would create an additional obligation for the three trainers during a practice, he did not indicate that such an obligation would prevent the trainers from performing their other obligations under normal circumstances.  Furthermore, the members of the training staff already monitor certain players for other medical conditions; for example, a member of the training staff performs a blood sugar test on at least one diabetic player before, after, and at least one time during each practice.

## III.   CONCLUSIONS OF LAW

Both Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act prohibit discrimination against people with disabilities.  Title II of the ADA states that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or denied the benefits of the services, programs, or activities

---

[8] Nor is there any risk of increased liability for the University because Class has indicated that he is willing to sign a waiver before participating.

[9] Again, Class and his family have indicated that they will cover the costs associated with the Institute's involvement.

[10] Notably, the Institute's test summary reports indicate that these periods are "generally the riskiest time of the year from heat illness."  *See* Pl.'s Exs. 3 &4; Def.'s Ex. 2.

of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Similarly, Section 504 provides that "[n]o otherwise qualified individual with a disability in

the United States . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.  Because the

language of Title II of the ADA and Section 504 is substantially similar, the United States

Court of Appeals for the Fourth Circuit analyzes the two statutes together. *See Seremeth v. Bd.*

*of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336, n.1 (4th Cir. 2012).  To prove a violation

of either the ADA or Section 504, a plaintiff must establish that: (1) he has a disability; (2) he

is "otherwise qualified to receive the benefits of a public service, program, or activity"; and

(3) he is "excluded from participation in or denied the benefits of such service, program, or

activity, or otherwise discriminated against, on the basis of [their] disabilit[ies]." *Constantine v.*

*Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).[11]

   In assessing this third element of a disability discrimination claim, there are "three

distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate

impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt.*

*Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008).  As explained by Judge Chasanow in *Adams v.*

*Montgomery College (Rockville)*, 834 F. Supp. 2d 386, 393 (D. Md. 2011):

> The requirement that a public institution make reasonable
> accommodations for disabled individuals finds support in the
> implementing regulations of Title II, which provide that "[a]
> public entity shall make reasonable modifications in policies,
> practices, or procedures when the modifications are necessary

---

[11] In addition, to prove a violation of Section 504, Class must show that the University receives
federal funds. *See* 29 U.S.C. § 794(a).  This element is not in dispute in this case.

> to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Based on this provision, the Fourth Circuit has held that Title II of the ADA and the Rehabilitation Act require public entities to make reasonable accommodations for persons with disabilities. *See Helping Hand*, 515 F.3d at 362; *Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 174–75 (4th Cir.2009); *Constantine*, 411 F.3d at 488.

*Id.*; *see also Constantine*, 411 F.3d at 488 ("Title II imposes an affirmative obligation to make 'reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services' to enable disabled persons to receive services or participate in programs or activities." (quoting 42 U.S.C. § 12131(2))); 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

## A. Whether Class is Disabled

Under the ADA, an individual is regarded as having a disability when the individual "(A) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) [has] a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1). As explained in *Summers v. Altarum Institute, Corp.*, 740 F. 3d 325 (4th Cir. 2014), Congress broadened the definition of "disability" in 2008 so that the term would "be construed in favor of broad coverage of individuals under [the Act], to the maximum extent permitted by the terms of [the Act]." *See*

*id.* at 329 (quoting 42 U.S.C. § 12102(4)(A)).[12]  Additionally, the 2008 Amendments state that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."   42 U.S.C. § 12102(4)(D).

At the hearing, the evidence showed that Class suffered an exertional heat stroke in August of 2013.  As a result of his heat stroke, Class received a liver transplant.  Due to his heat stroke and subsequent transplant, Class' ability to walk, care for himself, and lift objects was severely impacted for several months.  Moreover, Dr. Hutson testified that, due to Class' status as a transplant recipient, further surgeries affecting his liver and abdomen would be more complicated.  Based on the facts presented at the hearing, Class has satisfied his burden of demonstrating an actual disability—both as a transplant recipient and victim of heat stroke—that seriously affected major life activities.[13]  Under *Summers*, the temporary nature of his condition does not bar a claim.  *See* 740 F.3d at 329, 333.  Moreover, the evidence at trial indicated that Class may be at an increased risk of a reoccurrence of heat stroke as a result of his original injury—or in other words, that Class' disabilities are currently in remission.

---

[12] The 2008 Amendment was titled the ADA Amendments Act of 2008, Pub. L. No. 110-325.

[13] In its Motion to Dismiss, the University argued that Class' claims should be dismissed because football is not a major life activity.  Although this Court denied the Motion to Dismiss in a ruling from the bench, it did not expressly address this argument.  For the sake of clarity, this Court points out that the ADA does not require that the "service[], program[], or activit[y] of a public entity" in which a disabled plaintiff seeks to participate be a "major life activity."  Instead, the statue merely requires that the plaintiff's "physical or mental impairment" substantially impair "one or more major life activities of such individual."  Indeed, the University's reading of the statute would result in a dramatic—and wholly unsubstantiated—restriction of the scope of the ADA and the Rehabilitation Act.

Alternatively, Class clearly qualifies as an individual with a record of a protected disability under 42 U.S.C. § 12102(1)(B).  The Court recognizes that the University argued at the motion to dismiss stage that such a claim was not explicitly pled in the Complaint and therefore could not form the basis of Class' claims.  Although this Court did not expressly rule on this point in its ruling from the bench on June 30, 2015, this Court finds that the Complaint provided adequate notice of a record of disability claim.  Moreover, a finding of disability for the purposes of the ADA on the basis of Class' record of serious medical conditions would not produce any unfairness because Class' medical record was clearly the subject of the discovery performed in this case.[14]

## B.  Whether Class is Otherwise Qualified

In its motion to dismiss, the University argued that Class was not otherwise qualified because his medical condition and requested accommodation—i.e., periodic monitoring— would interrupt the flow of practices and games.  The evidence at trial showed, however, that the CTM System can be used unobtrusively, and there was no evidence that use of the CTM System—which requires three to five seconds to measure an athlete's temperature at an interval of five to ten minutes—was unfeasible based upon the nature of the game of football.  Indeed, despite the State's unsubstantiated assertions that Class would have regularly had to remove himself from participation, the testing performed by the Korey

---

[14] On the other hand, Class' third claim pleads a "regarded as" claim under 42 U.S.C. § 12102(1)(B). Because the evidence at trial supporting the safety of Class' participation in football was dependent upon the availability of his requested accommodations, there is no basis for Class to proceed under such a claim.  *See* 42 U.S.C. § 12201(h) ("A covered entity ... need not provide a reasonable accommodation ... to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."); *see also Ryan v. Columbus Regional Healthcare Sys.*, No. 7:10-CV-234-BR, 2012 WL 1230234, at *5 (E.D.N.C. Apr. 12, 2012) ("[A]n individual who is "regarded as" disabled is not entitled to a reasonable accommodation.").

Stringer Institute indicates that Class has the physical health and conditioning to be able to withstand the rigors of a collegiate football practice. *See* Pl.'s Ex. 4. Accordingly, this Court finds that Plaintiff is otherwise qualified to participate in the University's football program.[15]

### C. Discrimination on the Basis of Disability

It is undisputed that Class' medical conditions are the reason that the University has refused to permit Class to participate in the University's football program.[16] However, the University has argued that "protecting Plaintiff against placing himself at medical risk does not constitute discrimination, either intentional or unintentional, under the ADA or Rehabilitation Act." Def.'s Mem. Supp. Mot. Dismiss at 20, ECF No. 11-1. This argument, of course, relies upon the assumption that Class' participation creates an unreasonable risk to his health arising from his medical conditions. The University has failed to present any evidence supporting that assumption. Indeed, the testimony of Dr. Hutson and Dr. Casa provided direct evidence to the contrary. The evidence at the hearing indicated that Class is at no increased risk if his requested accommodations are provided. Accordingly, the

---

[15] Although the issue was never expressly raised in this context, the University has at times alluded to the fact that Class would need to obtain waivers from the NCAA before he could play football for the University based upon his NCAA eligibility. This relates to NCAA rules of eligibility in light of a student-athlete's years as a college student. It does not relate to Class' medical condition. Accordingly, this fact does not alter this Court's conclusion with respect to the ADA and Rehabilitation Act. The NCAA waiver process would be initiated by the University—a process that the University has engaged in on many occasions for various athletes. Moreover, it is undisputed that the University has not even attempted to initiate such a procedure because it has refused to permit Class to play based upon his medical conditions.

[16] The University has been somewhat inconsistent regarding the precise basis for its decision. Athletic Director Tim Leonard suggested that the reason was based purely on Class' propensity for heat stroke, while Dr. Kindschi represented that her decision was premised upon Class' whole case. Class' Complaint clearly addresses the potentiality that the University's decision was based upon either his heat stroke or his liver transport, or both conditions; accordingly, as should be apparent from this Court's analysis to this point, this Court has addressed both issues.

University's reliance on this asserted medical risk is misplaced.[17]   Indeed, the failure to provide reasonable modifications and accommodations is one method of demonstrating disability discrimination under Title II.   *See A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008); *Adams v. Montgomery College (Rockville)*, 834 F. Supp. 2d 386, 393 (D. Md. 2011).

### D. Reasonable Modification

A disabled individual must be able to propose a reasonable modification or accommodation in order to state a *prima facie* case of disability discrimination.   *See Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d. 772, 789 (D. Md. 2001) (holding that a plaintiff must first prove that a modification or accommodation is reasonable and necessary before the fundamental alteration defense is addressed).   In general, the reasonableness of a proposed accommodation or modification is a fact-intensive inquiry. *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d. Cir. 1995).   The effectiveness of the accommodation is one factor to be considered.   *Id.*   As indicated above, this Court finds as a factual matter that the accommodations requested by Class in this matter are reasonable.

### E. Fundamental Alteration

In light of the fact that Class has established a *prima facie* case of disability discrimination under the ADA and Rehabilitation Act, the University must prove that

---

[17] During the hearing, the University emphasized that it only had the results from the original two heat tolerance tests to consider when making its decision.  (Class and his family demanded a determination from the University by April 30, 2015 on Class' ability to play).  Indeed, the third, more intensive heat tolerance test was not performed until June—i.e., after this lawsuit was initiated. Nevertheless, despite this additional testing, which was in fact produced during discovery, the University has refused to change or modify its decision.  This Court's analysis under the ADA requires consideration of all the evidence before it; the scope of review is not limited to the situation as it existed on April 30.

providing the accommodations would constitute a fundamental alteration of its football program or impose an undue financial or administrative burden on the University. *See* 28 C.F.R. § 35.164; *see also Tennessee v. Lane*, 541 U.S. 509, 532 (2004).  The relevant inquiry in this case focuses on a "fundamental alteration" because Class and his family have indicated that they will pay the costs associated with implementing the CTM System to monitor Class and there is no evidence of an increased administrative burden on the University due to the use of the system.   Essentially, the University must demonstrate that the proposed accommodation—the use of the CTM System and protective padding over Class' abdomen—would, in practice, "be unreasonable to implement."  *Disabled in Action*, 752 F.3d at 202.

The University, however, has failed to present any credible evidence to that effect. There was no indication that Class' proposed accommodations would create dissention among the other members of the football team.  Moreover, both Dr. Hutson and Dr. Casa testified that Class is currently physically able to return to football, and there was no evidence that Class would be unable to withstand the rigors of a collegiate level football practice. [18]  Accordingly, there is no merit to the University's argument that Class' participation would constitute a fundamental alteration because he would only be

---

[18] Indeed, Dr. Kindschi's testimony concerned the safety of Class' return.  She never opined that he would be unable to complete a collegiate football practice, and the Institute's most recent heat tolerance test indicates that Class would be able to meet the physical demands of a collegiate level practice for linemen.

participating on a part-time or optional basis.[19]   Indeed, the University has been unable to present any credible evidence to support a fundamental alteration defense.

Although the University has not expressly raised this issue in this context, the University has repeatedly pointed to its "Return-to-Play" Policy and argued that its actions have strictly adhered to that Policy.   However, the mere existence of the Policy—and the University's compliance with it—of course does not excuse the University from compliance with the ADA. *Cf. Mary Jo C. v. N.Y. State and Local Retirement Sys.*, 707 F.3d 144, 163 (2d. Cir. 2013) ("[T]he ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of inconsistent state laws, when necessary to effectuate Title II's reasonable modification provision.").   Nor does this Court's ruling require the University to abandon the Policy in the future.   Indeed, this Court merely finds that, under the circumstances of this case, the University's application of the Policy in this case is discriminatory.   It continues to refuse to provide a reasonable accommodation to Class based upon a medical determination that ignores contrary opinions of medical experts in areas pertaining to Class' injury and for which, as the hearing testimony demonstrated, there is no basis in articulable evidence- or research-based support from experts in the relevant medical fields.

## IV.   REMEDIES

---

[19] Specifically, the University compared Class' situation to an employee who seeks optional attendance to work. *See, e.g.,* Def.'s Reply to Mot. Dismiss at 9, ECF No. 19. The University characterized Class' requested accommodation as "carte blanche to stop the clock, interrupt the action, and leave the field on a moment's notice, at any point in any game or practice session," and therefore concluded that Class would be unable to meet the "baseline qualification" of "show[ing] up and perform[ing], regularly and reliably." *Id.*

In his Complaint, Plaintiff requests the following relief;

    a.   Declare that Towson's decision not to reinstate Mr. Class to the Towson football team is discriminatory and violates Section 504 of the Rehabilitation Act;

    b.   Issue a preliminary and permanent injunction ordering the University to allow Mr. Class to fully participate in Towson's football program;

    c.   Issue a preliminary and permanent injunction ordering the University to provide reasonable accommodations to Mr. Class to fully participate in Towson's football program; and

    d.   Award reasonable attorneys' fees, costs and any and all other relief deemed appropriate by this Court.

Pl.' Compl. 45, ECF No. 1.

By agreement of counsel, Plaintiff no longer seeks preliminary injunctions. Thus, the main question for this Court to resolve is the extent to which Plaintiff is entitled to injunctive relief in the form of a permanent injunction.[20]

As noted above, this Court finds that Towson University has and continues to violate the ADA and Section 504 of the Rehabilitation Act by denying Gavin Class the right to actively and fully participate in the University's football program. Accordingly, Plaintiff is entitled to a declaratory judgment to that effect.

A party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Evidence relevant to satisfying the irreparable harm inquiry is intertwined with the

---

[20] This Court does not address Plaintiff's demand for attorney's fees at this time.

evidence relevant to the inadequate remedy inquiry. *Humanscale Corp. v. CompX Intern. Inc.*, No. 3:09-CV-86, 2010 WL 1779963, at *4 (E.D. Va. April 29, 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)).

As noted above, Class is entitled to judgment on his claims. With respect to irreparable harm, he has adequately shown that he will be deprived of the opportunity to fully participate on a NCAA Division I football team for which he is otherwise qualified if this Court does not grant the injunction. In *McFadden v. Grasmick*, 485 F. Supp. 2d 642, 646–647 (D. Md. 2007), this Court noted that denying a handicapped individual the ability to earn points as a member of her track team, leaving her a "member" of the team but only in "spirit," clearly constituted irreparable harm. Similarly, this Court finds that preventing Plaintiff from the opportunity to earn a spot on the team and participate in games "unequivocally imposes an intangible injury . . . that is real and substantial." *Id.* at 647.

Class has also demonstrated that the balance of the equities tips in his favor. Under the ADA, a public entity is not required "to undertake measures that would impose an undue financial or administrative burden . . . or effect a fundamental alteration in the nature of [a] service." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). There was no testimony to support the Towson Athletic Director's concern that Class' requested accommodations might affect team focus and morale; therefore, his requested accommodations will not alter the nature of the program. As to undue burden, as discussed *supra*, most of the accommodations Plaintiff seeks are procedures already in place by Towson University and will therefore not create any undue burden on Towson staff. With regard to the core temperature monitoring system, Dr. Kindschi testified about her concern that using the system was outside the scope of an

athletic trainer. In response, Plaintiff has agreed to pay for a KSI official to implement the system and monitor him during the first two weeks of practice in August. Further, according to Towson's Director of Sports Medicine, athletic trainers already perform monitoring procedures during practice for players with conditions such as diabetes. Granting the injunction will therefore not impose any undue burdens on the Towson football program nor demand so much individual attention as to alter the nature of the program.  The injunction will however allow Gavin Class to be a full member of the team.[21] Therefore, the balance of equities tips in his favor. *Cf. McFadden v. Grasmick*, 485 F. Supp. 2d 642 (D. Md. 2007) (finding that the balance of harms tipped in plaintiff's favor when denying the injunction would limit the plaintiff's ability to fully participate on the track team and defendants difficulty was "simply that they have not yet figured out how to [allow the plaintiff to compete] in a fair and equitable manner").

Finally, Class has demonstrated that an injunction would be in the public interest. As this Court explained in *McFadden*, "it is clearly in the public interest to provide for full and meaningful participation of persons with disabilities in . . . athletic programs." *McFadden*, 485 F. Supp. 2d at 651. An injunction would assure that individuals like Gavin Class, who suffered a catastrophic injury but was able to recover and can once again safely participate in a program, have the opportunity to do so. While Towson University has raised the issue of compliance with its own procedures, as discussed *supra*, "such compliance cannot trump the federal dictates of the ADA and the Rehabilitation Act." *Nat'l Fed'n. of the Blind, Inc. v. Lamone*, Civ. A. No. RDB-14-1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014); *see also*

---

[21] As previously noted, this Court's ruling has no effect on the issue of Class' NCAA eligibility.  *See supra* notes 1, 15.

*Mary Jo C. v. N.Y. State and Local Retirement Sys.*, 707 F.3d 144, 163 (2d. Cir. 2013) ("[T]he ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of inconsistent state laws, when necessary to effectuate Title II's reasonable modification provision."). As Class has met all four requirements, this Court will issue a permanent injunction that prohibits Towson University from further violating his right under the ADA and Rehabilitation Act to fully participate in the Towson football program.

## V.     CONCLUSION

For the reasons stated above, by separate order, JUDGMENT will be ENTERED in favor of Plaintiff Gavin Class against Defendant Towson University with respect to his claims under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act. Defendant Towson University will be PERMANENTLY ENJOINED from violating his rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation by prohibiting him from participating in the University's football program resulting from medical concerns related to his status as a transplant recipient and heat stroke victim.

A separate Order and Judgment follows.


Dated: July 17, 2015                        ____/s/_____
                                            Richard D. Bennett
                                            United States District Judge